UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

Case No. 11-CR-20557-MOORE/TORRES

THE UNITED STATES OF AMERICA,

　　　　　Plaintiff,

　　　　　　　　　　　　　　　　MIAMI, FLORIDA
vs.　　　　　　　　　　　　　　OCTOBER 26, 2011

LAVONT FLANDERS, JR.
AND EMERSON CALLUM,

　　　　　Defendants.
_____

TRANSCRIPT OF PRETRIAL DETENTION HEARING
BEFORE THE HONORABLE BARRY L. GARBER,
UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

FOR THE GOVERNMENT:

　　　　　　　　　　UNITED STATES ATTORNEY'S OFFICE
　　　　　　　　　　FOR THE SOUTHERN DISTRICT OF FLORIDA
　　　　　　　　　　99 N.E. 4th Street
　　　　　　　　　　Miami, Florida 33132
　　　　　　　　　　BY: ROY ALTMAN, A.U.S.A.

FOR THE DEFENDANT FLANDERS:

　　　　　　　　　　BY: CHRISTIAN S. DUNHAM, ESQ.
　　　　　　　　　　40 N.W. 3rd Street
　　　　　　　　　　Penthouse 1
　　　　　　　　　　Miami, Florida 33128

REPORTED BY:　　　　JERALD M. MEYERS, RPR.
　　　　　　　　　　J.M. COURT REPORTING, INC.
　　　　　　　　　　1601 N.W. 109th Terrace
　　　　　　　　　　Pembroke Pines, Florida
　　　　　　　　　　Telephone: 954-431-4757
　　　　　　　　　　E-mail Address: CRJM@AOL.COM

(Call to order of the Court)

THE CLERK:  The United States of America versus Lavont Flanders, case number 11-20557-Criminal-Moore.

Counsel, please state your appearances for the record.

MR. ALTMAN:  Good morning, Your Honor.  Roy Altman on behalf of the United States.

THE COURT:  Yes, sir.

MR. DUNHAM:  Good morning, Your Honor.  Christian Dunham on behalf of Lavont Flanders who is present.

THE COURT:  All right.  Have you entered a permanent appearance in this matter?

MR. DUNHAM:  Yes, Your Honor.

THE COURT:  All right.  The matter is on for a bond hearing.  Previously what happened with regard to the issue of bond or release?

MR. ALTMAN:  Your Honor, it is actually on for a detention hearing.  The government is seeking detention.  Obviously, the defendant is seeking bond.

THE COURT:  All right.

MR. ALTMAN:  Initially, when the defendant was first arrested, we both stipulated to detention but with the right by both parties to revisit, and the defendant has elected to do that now.

THE COURT:  All right.  Fine.  So the detention order is in effect until it is overcome, if it is.

MR. ALTMAN:  That is correct, Your Honor.

THE COURT:  All right.  Counsel, are you prepared to proceed?

MR. DUNHAM:  Yes, Your Honor.

THE COURT:  All right.  Would you give the court an idea of what you are proceeding on prior to me taking any testimony?

MR. DUNHAM:  All right.

THE COURT:  What is the basis for your motion?

MR. DUNHAM:  Your Honor, he is not a risk of flight and he is not a danger.

THE COURT:  Well, how do I know that?

MR. DUNHAM:  Your Honor, I have witnesses ready to testify.

THE COURT:  All right.  Let's do so.  Let's call them.

MR. DUNHAM:  Okay.

MR. ALTMAN:  Your Honor, would you like me to give a slight factual background about the case first?

THE COURT:  Yes.  That would be helpful.

MR. ALTMAN:  All right.  Your Honor, this case has been indicted and so, as Your Honor is I am sure well aware, there has already been found probable cause to believe that the defendant committed the 22 crimes contained in the indictment.

Most of those crimes are violations of 18, U.S.C. Section 1591 which charges that the defendant enticed women to

come to Florida, and then knowing that they would be engaged in commercial sex acts, used fraud to get them to engage in those acts, and each of those crimes, Your Honor, is a crime of violence and, thus, does trigger the presumption under the Bail Reform Act that the defendant is both a risk of flight and a danger to the community.

I will also say, Judge, that each of those crimes carries a mandatory minimum penalty of 15 years and a maximum of life, and the guidelines for each offense is essentially life because they do not group together because they are all different victims, and there are 8 victims in this case.

Your Honor, I have made clear to the defense that if, and I realize this is a big if, if the defendant is convicted at trial, the government will be asking for a sentence of life as to each and every victim in the indictment, which I think is powerful incentive for any man to flee.

I will tell you a little bit about the case, Judge, before we move on and why I think the defendant is both a danger and a risk of flight.

First of all, the case involves from about 2006, approximately 50 women from all around the country, 30 of whom either the agents, the detectives or I have interviewed who have been contacted by what they thought was a female model or modeling scout over the Internet.

These are all aspiring models. They are from all over

the country.  They have never met one another, and they do not know one another, and yet they tell almost identical stories about their, frankly, horrifying interactions with this man and with his co-defendant, Mr. Callum.

The scam always began the same way.  They were contacted over the Internet by e-mails by what they felt were women.

Now, we have been able to trace, and like I said, we are calling 8 of these victims at trial.  For 6 of those victims, we have been able to trace those e-mails that came purportedly from female models directly to this defendant, and we will be able to prove that it was the defendant, in fact, who used these female aliases to contact and lure these models, with the promise of modeling or acting auditions for famous companies that we all know, Bicardi and Olympic Models.

Of course, at trial these companies will all send representatives to come and testify that this defendant has never worked for them.  They have no idea who he is.  He was basically lying to these women about that.

The women would then send him their phone number when they heard his e-mail or when they saw his e-mail, and then they would receive shortly thereafter a series of phone calls, all from block numbers.

Again, Judge, we have been able for each and every one of the 8 victims to show that those blocked phone calls came

from different phone numbers used by this defendant.

In each of those phone calls and with each woman the defendant would use a separate alias; a second alias.  Names like Ladarias Cove or Darias or Larry Griffin, Eric Lawson and Eric Farmer; names that are, of course, not simply his, and during the course of these phone calls, the defendant would promise these victims that he worked for again Bicardi, Sony Productions, Paramount Pictures and any number of famous companies that we all know about and tell them about this soon to expire very exciting opportunity to audition for a part either in a movie, in a Bicardi commercial or for this modeling agency known as Olympic Models.

Olympic Models, Your Honor, is a modeling agency out of Austria.  I have met with their owner.  It was created by a woman named Tamara in Austria with her best friend from high school.

They are the only two employees.  They are both in Austria.  They have never been to the United States and, of course, they have never heard of the defendant.

So these women over the course of these conversations were persuaded over the course of several days and weeks by the defendant to fly down to Miami on their own dime for these modeling auditions, and they would fly down here.

They would check themselves into hotels.  The defendant had promised them that if they got the part they

would be reimbursed for all of this.

They would meet with the defendant, either in a parking lot or in an office building, and the defendant would show them photographs of different models that he said he had photographed before, that he had worked with, and then he would have them enact a scripted commercial scene that involved drinking alcoholic beverages that he provided them, sort of like in a bar scene to pretend that they were part of this Bicardi ad, and, of course, sometime later, after they had ingested the alcoholic beverages, all of the women tell exactly the same story.

About 15 to 20 minutes later, the women begin to feel very, very groggy.  They begin to feel very, very dizzy, and they begin to feel sort of not like themselves.  Very passive, and some of them black out entirely.

They don't remember anything until the very next day when they wake up, some of them bleeding from their vaginas, some of them covered in their own vomit or urinating uncontrollably, and in either case very, very groggy unable to remember what had happened the night before.

Some of them do have memories about what had happened. Some of them have flashes of what is called fragmentary memory of another man having sex with them; a man they don't know and a man most of them cannot identify even now, because they were so out of it, while Mr. Flanders, the defendant, filmed and at

all times gave directions and instructions to them to do this or do that.

So what happens is ultimately, Your Honor, law enforcement is able to find out that what has been going on is that these women are being drugged.  Many of them, of the 8 victims that we have in this case, 5 of them test positive the very next day for the presence of a drug called Alprazolam, which is essentially Xanax.

We have met with the world's most reknown expert on Alprazolam.  Actually, he has studied at Harvard Medical School.

He is now the director of pharmacology at Tufts Medical School.  He has written numerous articles and done at least ten clinical studies on the interaction of Alprazolam with other drugs, in particular alcohol, and what he has found and what other experts in the field have found is that Alprazolam has many of the effects that these women talked about.

One of the effects of Alprazolam, Your Honor, is that it is not like Haldol or some other drug that totally incapacitates you.

When you are on Alprazolam, especially mixed with alcohol, when you ingest it quickly, often times you will look for several hours as though you are somewhat normal.

Your motor skills may be less refined, but you won't

look like you are passed out, and then you will have what is called either complete or fragmentary black-outs, which is you don't remember almost anything at all, and you become very passive or disinhibited, and maybe much more easily taken advantage of.

In this respect, Your Honor, Alprazolam is almost identical in its molecular composition and its pharmacological effects to roofies, Rufinal, which, of course, has been banned by the United States Congress.

Xanax does have positive pharmacological logical effects, and that's why it is legal, but when mixed with alcohol, it could be lethal and dangerous as it was in this case.

So, Your Honor, for a long time the police departments really didn't have many leads.  The police departments didn't know who Mr. Flanders was because he was using so many aliases, and because he used a perfect weapon, a drug that wiped these womens' memories, but at the end of 2006 and the beginning of 2007, they got two breaks.

One of them was when a victim, A.T. woke up from her drug induced daze, just as Larry Griffin, the modeling scout, actually Mr. Flanders was dropping her back off at her car.

She knew that something was wrong, and she called 911. And as the defendant was driving away, she managed as she was stumbling back onto her car to write down his license plate

number.

That license plate number, when she gave it to police officers, of course, came back to Mr. Lavont Flanders.

She was shown a photographic line up that included his picture, and she identified him as Larry Griffin, the modeling scout who had contacted her and promised her the Bicardi audition.

When she was shown the photo of Mr. Flanders' co-defendant, Mr. Callum, who on the pornographic video, and I will get to that in a moment, she is seen having sex with Mr. Callum for approximately 20 minutes.

She couldn't recognize him.  She doesn't know him, even though she had sex with him for a protracted period of time.

Later, in 2007, another victim, J.H., woke up with no memory of what had happened to her the night before.

She woke up in a pool of her own vomit.  She was very groggy.  She was very hung over.  She called the police with the help of her boyfriend because she couldn't manage to dial the numbers.

The police showed up, and when they heard her story, they realized that it comported to a significant degree with the interactions that many of these other women had had with Mr. Flanders, with this modeling scout, except for one important detail which was that usually the modeling scout

drives in his car with the victim to the studio where they get sexually assaulted.

In this particular instance, for whatever reason, Mr. Flanders had gotten into her car, and so police thought to fingerprint the entire car, and they found two fingerprints belonging to Mr. Flanders, of course, on the driver's side door of her car.

What happened also with that case, Your Honor, is that they were able to take her e-mails that she had received from a woman, Karen Watson, who is, of course, Mr. Flanders and traced all of those e-mails back to Mr. Flanders house where he was living at the time.

So they got a search warrant.  They went into the house and they found a bunch of pornographic DVD's on which some of the reported victims are seen performing sexual acts with Mr. Callum.

As I said before, Your Honor, for most of the videos the victims appear maybe somewhat sluggish, but mostly awake, alert and responsive.

Towards the end of the videos, though, most of the victims deteriorate rather rapidly, and in most of the videos Mr. Callum is seen trying to lift the victims.  They cannot lift themselves.

They just lie there sort of passively as he perpetrates sort of a whole litany of sexual acts upon them.

12

And so what the police did was they saw Mr. Callum. They did a search on his business and found a pornography factory there and ultimately were able to arrest both Mr. Flanders and Mr. Callum.

Importantly, during Mr. Flanders post arrest statement, he lied to just about everything. He had never met Mr. Callum before, despite the fact that they are on the video together, despite the fact that they speak on the phone according to their phone records almost every day.

He said he had never been to an I-Hop on University Drive before with anybody, despite the fact that, of course, he had been there with two of the victims, and we know that because both victims pointed him out.

He said that he had never posed himself as a Bicardi's rep or an Olympic Models rep or a rep with any other agency.

He said that he had never been involved in any pornography whatsoever; that after work he just comes home and hangs out really by himself because he has no friends, and he said that his brother, who lived with him, Darrell Flanders, does not use any e-mail whatsoever, thus proving, of course, that those Karen Watson e-mails that had come from his house were sent by none other than Mr. Flanders himself, but I think what is most important in this case, Judge, is what happens after they are arrested in 2007, because that's important to why I think they are a danger to the community, in addition to

all of the other things that I have discussed, because when they were let out on bond in 2008, Judge, one of the specific conditions of bond is they do not associate in any way with pornography, and yet what we found, Your Honors, is that since their release in 2008, Mr. Flanders and Mr. Callum picked up their pornography business, picked up their enticement business, their fraudulent business right where they left off as if 2007 had never happened, as if there had never been any arrest whatsoever.

So we have 3 victims who will testify at trial that they had almost identical interactions with Mr. Flanders and Mr. Callum as the pre-2007 victims.  Those are L.W., L.H. and the most recent one, R.W.

These are women again who received e-mails from female models.  Those e-mails we have all been able to trace back to Mr. Flanders.

They then received phone calls from a modeling scout using different names.  All of those names, again we have been able to trace back to Mr. Flanders.

All of those phone calls we have been able to trace back to Mr. Flanders various telephone numbers, and then they flew down to Miami, met with the modeling scout, did the audition, did the commercial script.

Again, afterwards, they began to feel very groggy. L.H. tested positive the next day for Alprazolam.  R.W. is so

out of it that she doesn't remember anything, and just goes back home to Pittsburgh and actually did not find out that even a pornographic video had been made or that she had ever had sex that night until I told her so a couple of weeks ago.

So, you know, Mr. Flanders, his house was searched on August 17th of 2007 pursuant to a search warrant after he was indicted, and that search, Your Honor, has led to I think it is an understatement, a treasurer trove of evidence; fake evidence that Mr. Flanders had created letters that he had written to people fabricating his involvement in this case, saying that he had never been on Model Mayhem; that he had never e-mailed any of these women, when, in fact, the search warrants of all of the computers in the house show several things, Judge.

First of all, they show that all of the computers have countless, hundreds of hits on Model Mayhem.com and blackplanet.com on the Websites of other models.

Mr. Flanders was literally stalking these women on all of the computers in his house.

In addition to that, Your Honor, three of the computers in the house have countless searches on Google, and we can see where those words were typed in where the defendant, excuse my language, Judge, was searching for "drug passed out roofie girls getting fucked," over and over again on all of these different computers, demonstrating I think a particular propensity and predilection by Mr. Flanders while he is at home

15

in the confines of his own home to research this essential aspect of his business.

So, Your Honor, like I said, Mr. Flanders has continued to do this business while he was on bond, in flagrant violation, of course, of the conditions of his bond, and in flagrant violation of the orders of the court.

In addition, he is facing life in prison, essentially. It is either life or he is acquitted.

I think it is a powerful incentive for him to flee, and lastly I will say, Judge, Mr. Flanders is a fraudster.

Mr. Flanders has no phone in his name. He has no house in his name. He has only one e-mail address, but various others that are not in his name. No car in his name. No business in his name.

Very little tying him to any particular place. In fact, we were only able to find him after the FBI agents searched for weeks online tracing different IP addresses that were used to contact the victims.

That is how we found him, because he was literally like a ghost for a very long time.

Your Honor, another thing I will say is that Mr. Flanders even lied to the Pretrial Services officer. There is an address on the Pretrial Services form that, of course, is not where Mr. Flanders is living at all.

That address is the address of his brother, Darrell

Flanders.  Mr. Flanders on every surveillance that we have seen is actually living with his girlfriend, Lucinda Roper.  And, in fact, all of the IP addresses, or many of the IP addresses that were used to contact the post 2008 victims trace back, after 2009 trace back to Ms. Roper's home and, of course, that's why Mr. Flanders did not want to admit that that is where he was living, but, in fact, we know because we spoke with Ms. Roper at the time of Mr. Flanders arrest that he has been living there since I believe the end of 2009, maybe the beginning of 2010.

So, Your Honor, the defendant's conduct I think is horrifying.  It is dangerous.  It is cynical.  It has ruined many, many different womens' lives.

He also has shown no regard for the orders of the court or the conditions of his bond, and I think that's the best indication that he cannot be trusted to abide by the conditions of bond in this case.

He also uses countless aliases and doesn't have really any assets or anything in his name by which we can really be assured that he will remain here in South Florida.

So, for those reasons, I think that the presumption has been amply supported by the record, and we would ask that the defendant be detained pending his criminal trial.

THE COURT:  All right.  Prior to hearing from Mr. Dunham, let's take about a 5 minute break.  All right?

MR. ALTMAN: Yes, sir.

THE CLERK: All rise. Court is now in recess.

[There was a short recess].

THE CLERK: All rise. This court is again in session.

THE COURT: Please be seated.

All right. Mr. Dunham, are you prepared to proceed?

MR. DUNHAM: Yes, Your Honor. Thank you.

I would like to or the government has been kind enough to bring the agent.

I would like to ask some questions after the government's proffer.

THE COURT: All right. Would you call the agent forward.

MR. ALTMAN: Yes, Your Honor. Detective Nikki Fletcher of the Miramar Police Department.

THE CLERK: Raise your right hand, please.

NIKKI FLETCHER, GOVERNMENT'S WITNESS, SWORN.

THE CLERK: You may be seated.

Please state your full name, for the record, and spell your last name.

THE WITNESS: My first name is Nikki, N-i-k-k-i. The last name is Fletcher. F-l-e-t-c-h-e-r.

THE COURT: Which group are you with?

MR. DUNHAM: I am with the City of Miramar. I am a police detective.

18

THE COURT: All right. Fine. Counsel.

MR. DUNHAM: All right. Thank you, Your Honor.

CROSS EXAMINATION

BY MR. DUNHAM:

Q. Hi, detective. How are you doing?

A. Good.

Q. Just briefly, so you are familiar or you are very familiar with the fact that Mr. Flanders was charged in Broward State Court, right?

A. Yes.

Q. And I guess you were the lead detective in those cases?

A. Yes.

Q. All right. And so you are familiar with the fact that Mr. Flanders never absconded from that court, right?

A. Correct.

Q. He always appeared in court as far as you know, right?

A. As far as I know, yes.

Q. He didn't evade justice on that particular case, right?

A. Correct.

Q. And you are familiar with the state court system as well, right?

A. Yes.

Q. And you are familiar with the fact that if a person is out on bond or released and commits a new crime, the state attorney can file a motion to revoke that person's bond, correct?

A.   Correct.

Q.   And that was never done in this case with Mr. Flanders; is that right?

A.   Correct.

Q.   And those Broward state cases did involve at least, I believe, a couple of the same victims that are in this federal indictment, correct?

A.   Correct.

Q.   And the same allegations.  Not just the same victims, but the actual same incidents; is that right?

A.   Correct.

Q.   And you are familiar with, there was a search of Mr. Flanders house I think back in 2007, correct?

A.   Correct.

Q.   And you are familiar with that search?

A.   Yes, I am.

Q.   And in that search, is it fair to say that there was Benzodiazepines found, correct?

A.   Yes.

Q.   But There was not actually Xanax found; is that correct?

A.   Benzodiazepine is in the Xanax family.  It is not Xanax per name, but it is a Benzodiazepine.

Q.   All right.  Well, it wasn't labeled "Xanax," was it?

A.   No.

Q.   All right.  Now, you are also familiar with -- well, in

this particular case was it fair to say that -- let me just ask the question.

One issue in this case is whether Mr. Flanders obviously gave Xanax or Benzodiazepine or Alprazolam to the women in a drink, right?

A.   Correct.

Q.   That's the allegations, correct?

A.   Correct.

Q.   And is it fair to say, also, that there is no direct testimony from any of the girls, any of the women, the alleged victims in the case, that Mr. Flanders actually put up, you know, a drug in a drink?  Is that fair to say?

MR. ALTMAN:  Objection, Your Honor.

THE COURT:  Sustained.  The results of the drink were brought up by counsel for the government in its proffer.  Go ahead.

MR. DUNHAM:  Okay.

BY MR. DUNHAM:

Q.   Well, is there any evidence that Mr. Flanders actually put drugs in the drink?

A.   He is the one that provided the drink to the victims.

Q.   Okay.  But the victims are not going to say that they actually saw him put a drug in the drink, right?

MR. ALTMAN:  Objection, again, Your Honor.

THE COURT:  Sustained.

BY MR. DUNHAM:

Q.   None of the victims actually were forced to drink the alcohol, correct?

A.   No.

Q.   They voluntarily drank the alcohol, right?

A.   They were performing a commercial shoot, yes.

Q.   All right.  But they agreed to do that, right?

A.   Yes.

Q.   They may not have known what was in the drink, but they agreed to drink it, correct?

A.   Correct.

Q.   And I think the government already testified or proffered that not all of these women tested positive for drugs, correct?

A.   Correct.

Q.   And, in fact, you are familiar with some of the women or all of these women were on videotape, correct, shooting the pornography, right, or at least most of them?

A.   Yes.  A large majority of them.

Q.   Well, you are familiar with A.T., right?

A.   Yes.

Q.   That was one of the victims that you were on the case with, right?

A.   Yes.

Q.   And in particular, let's talk about A.T.  She was on a video, right?

Nikki Fletcher - Cross

22

A. Yes.

Q. And in that video she actually spoke in a different language right? In German?

A. Yes.

Q. And she spoke in English as well, right?

A. Correct.

Q. And she also agreed that she wasn't under the influence of any drugs or alcohol on that video, right?

A. Correct.

Q. And she also signed a model release form, like a consent to do the pornography, correct?

A. Correct.

Q. And, in fact, most of these women, or least the videos that you have seen in this case, all of the women are asked on the video whether they are under the influence, right?

A. Yes.

Q. And they all say they are not, right?

A. Correct.

Q. And they also all are asked whether they are agreeing to do the pornography, right?

A. No. There is never any ask about agreeing to do pornography on there.

Q. Well, they are asked if they are there on their own free will, or something to that effect?

A. Sometimes.

Q.   Okay.  Sometimes.  But the women that are asked if they are there on their own free will, none of them say they are being forced to be there, right?

MR. ALTMAN:  Objection.  Relevance, Your Honor.

THE COURT:  Sustained.

MR. DUNHAM:  One second, Your Honor.

I have no further questions, Your Honor.

I would like to have just a brief argument regarding this case.

THE COURT:  All right.

MR. DUNHAM:  Thank you, your Honor.

MR. ALTMAN:  Your Honor, if I could just ask two questions, Your Honor.

THE COURT:  Go ahead.

MR. DUNHAM:  Oh, I am sorry.

THE COURT:  Go ahead.

REDIRECT EXAMINATION

BY MR. ALTMAN:

Q.   Detective Fletcher, have you shown the victims who appear in these videos the videos of themselves talking on camera?

A.   Yes, I have.

Q.   Tell us, please, what their reaction was?

A.   They are very emotional.  They start crying and they have absolutely no recollection of even being on the video or performing the acts that are in the video.

24

Q.   Have you shown the victims the model release forms that they signed?

A.   Yes.

Q.   First of all, they all did recognize their own handwriting, correct?

A.   Yes, they did.

Q.   What else did they say about those release forms?

A.   That they never remember signing any forms.

MR. ALTMAN:  Okay.  No further questions, Your Honor. Thank you.

[The witness was excused].

THE COURT:  All right.  Counsel.

MR. DUNHAM:  Thank you, Your Honor.

THE COURT:  I will hear your argument.

MR. DUNHAM:  I appreciate it, Your Honor.

First of all, Judge, in terms of risk of flight in this case, I know there is a presumption, but Mr. Flanders, as the court heard, he was charged originally in state court.

He was in state court for several years.  Never missed a court date.  What better evidence of his ability to come back to court and to fight the charges?

I mean, the trial in this case is actually set just a month down the line for November 29th.

I believe we have rebutted the presumption in this case regarding risk of flight.

He is a local guy.  I would proffer his father, Lavont Senior is present, as well as his fiancee, Cindy Roper.  They both work for Miami-Dade County.

He is a life long Miami resident.

THE COURT:  Are you saying that because he lives here he is not a risk of flight?

MR. DUNHAM:  No.  I am saying that the evidence that he had a state court case -- well, two things.

First, the evidence that he had a state court case, and he never failed to appear.  The state never filed a motion to revoke his bond.

He went to court, and that case is actually over now, and he is going to show back up in court.  So I believe that shows that he is not a risk of flight.

THE COURT:  What were the penalties that he was facing in the state court, if you know?

MR. DUNHAM:  I believe he was facing -- well, he had two different cases, so he was looking at at least 30 years, Your Honor.

THE COURT:  Well, there is quite a bit of difference here.  He is looking at possible life imprisonment on each of these counts.

Certainly that would give rise to an incentive to flee, wouldn't it?

MR. DUNHAM:  It could, Your Honor.

THE COURT:  All right.

MR. DUNHAM:  I am just stating the facts as I know them.

THE COURT:  All right.  Go ahead.

MR. DUNHAM:  Your Honor, also in terms of dangerousness, I mean the reason I was asking the questions about the drugs is because that's really the government's argument.

The government's argument is that if he is too dangerous to let this man out because he is going to go back out and drug women, and the fact is there is no direct testimony that Mr. Flanders put drugs in that alcohol.

There is testimony that he gave alcohol, but there is no testimony that he actually put it in there.

THE COURT:  All right.

MR. DUNHAM:  So, you know, in terms of dangereousness, it is not a crime to recruit women down here and lie to a woman, it is not a crime.

If it was a crime to lie to a woman, then we would all be in jail, unfortunately, but -- well, maybe not Your Honor. I am sorry.  But, you know, the crime is through fraud causing these women to do a commercial sex act.

In the fraud they are saying is that he drugged the women, but there is really no direct testimony that he did it.

THE COURT:  Well, I think the testimony indicates that

although there apparently may not be proof of his putting drugs in the drink, he served the drinks, and the result of it thereof they were under some sort of influence of a narcotic or a drug.

I think the logical inference then would be that he did it.  All right.  Let's go ahead.

MR. DUNHAM:  No, Your Honor.  I mean, I just wanted to bring up to the court, like I said, his family is here.

He is a life long resident.  I don't think he is a danger to the community and I don't think he is a risk of flight.

THE COURT:  All right.

MR. DUNHAM:  We are ready to proceed with the court's ruling.

THE COURT:  All right.  The court has listened carefully.

I have examined the underlying records.  I have listened very attentively to the proffer made by the government.

The court finds that the statutory presumption has not been rebutted; that the defendant, if released, would represent a danger in the community based upon the allegations set forth in the indictment and the many charges.

The court finds further that he would represent a danger to the community and a risk of flight.

The court finds there are no conditions that could be set that would assure me of his presence for future court proceedings or remove the threat of danger in the community.

Indeed, I find he does represent a substantial danger in the community if released.

Accordingly, the defense motion for bond is hereby denied.

MR. DUNHAM:  Thank you, Your Honor.

(Whereupon the proceedings were concluded)

C E R T I F I C A T E

I hereby certify that the foregoing is an accurate transcription of proceedings in the above-entitled matter.

FEBRUARY 24, 2012          S/JERALD M. MEYERS

_____          _____
    DATE                     JERALD M. MEYERS, RPR-CM