

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 11-CR-20557-KMM**

UNITED STATES OF AMERICA

v.

EMERSON CALLUM
a/k/a "Jah-T,"

Defendant.
_____/

## GOVERNMENT'S RESPONSE IN OPPOSITION TO DEFENDANT'S REQUEST FOR COMPASSIONATE RELEASE

Emerson Calum is serving a life sentence for a sex trafficking conspiracy in which he and his codefendant lured innocent women to audition for modeling contracts and then drugged, raped, and filmed the women, and sold videos of their sexual abuse online for a profit (PSI at ¶ 4-11). The United States of America therefore vehemently opposes Emerson Callum's (the "Defendant" or "Callum") Motion for Compassionate Release pursuant to 18 U.S.C. § 3582(c)(1)(A) (DE 362). In his motion, the Defendant argues that his age, length of time served, changes in the law, rehabilitation and unusually harsh prison conditions support his position (DE 362 at 1); however, he cannot establish that extraordinary or compelling reasons justify his release under § 3582(c)(1)(A). Moreover, given the atrocious nature of his offense, the § 3553(a) strongly disfavor release, and he remains a danger to the public. Thus, Callum's motion must be denied.

### I.    FACTUAL BACKGROUND AND PROCEDURAL HISTORY

#### a.  The Sex Trafficking Conspiracy

Beginning in May 2006, Callum and his codefendant, Lavont Flanders, Jr., entered into a conspiracy to enrich themselves by unlawfully selling copies of video recordings they created by

luring women, under false pretenses, to audition for what the women believed were legitimate modeling or acting contracts (PSI at ¶ 4). The defendants had the women consume alcoholic beverages which, unbeknownst to them, contained benzodiazepines. *Id.* Once the women were under the influence of the drugs, the defendants coerced them to participate in sexual acts which they then recorded. *Id.* Flanders would identify the potential victims by searching for aspiring actresses and models on different websites. (PSI at ¶ 5). Flanders would email the victims, while pretending to be a representative from well-known modeling and acting agencies, and express his interest in their "look." *Id.* Flanders told the victims about lucrative, soon-to-expire contacts, with high-profile companies, and promised to put the victims in touch with "modeling scouts." *Id.* once the victims provided Flanders with their contact information, Flanders would call them, pretending to be the modeling scout, and offer auditions on behalf of large corporations like Sony, Paramount Pictures, and others. *Id.*

When the victims arrived in South Florida, Flanders informed them that they needed to act out a scene as part of the audition (PSI at ¶ 6). He instructed the victims to drink from a small bottle of alcohol, which contained benzodiazepines. *Id.* After the women were drugged, Flanders drove them to another location, where Callum would rape them while Flanders filmed it (PSI at ¶ 7). Some victims recalled waking up in a strange room only to realize that Callum, a complete stranger, was having sex with them while Flanders recorded the acts. *Id.* Callum proceeded to distribute these pornographic videos online through his pornographic production company (PSI at ¶ 8).

Three victims reported the incidents to police and later tested positive for the presence of Callum's DNA (recovered from vaginal swabs of their rape kits) and benzodiazepine (PSI at ¶ 9). Callum was arrested by local authorities and charged in Florida Circuit Court for these offenses in

September 2007. *Id.* He posted bond and was released. *Id.*

Despite his arrest and pending prosecution, Callum remained undeterred. Between May 2010 and 2011, Callum and Flanders continued their scheme, which resulted in the luring, raping, and recording of two additional victims. (PSI at ¶¶ 10-11). Notably, at least one of the victims awoke in a hotel room the morning after Callum raped her, bleeding from both her mouth and vagina. *Id.* at ¶ 11. This victim later located vomit and a condom in her trashcan. *Id.*

Federal authorities arrested Callum and Flanders in August 2011. *Id.*

### b. Callum's Conviction and Sentence

Both Callum and Flanders proceeded to trial. During the trial, the jury heard testimony from seven victims and watched portions of their videos. The jury returned guilty verdicts on Counts 1-18 and Count 20.

At the sentencing hearing, the district court overruled the defendants' objections to the presentence investigation report, adopted the advisory guideline range, and granted the United States' motion for an upward variance. This Court concluded that a sentence of life imprisonment was reasonable, and the Eleventh Circuit affirmed the reasonableness of the life sentence (DE 299) (USCA mandate affirming conviction and sentence).

### c. Callum's Appeal and Post-Conviction Motions

Callum timely appealed and raised multiple issues before the Eleventh Circuit, including the reasonableness of his sentence. *Id.* The Court of Appeals affirmed his sentence, reasoning that the defendants' offenses were "abhorrent." (DE 299 at 41).

In or around October 2023, the defendant submitted a request for compassionate release with the warden at FCI Coleman, asserting that his life sentence is extremely and unusually long and that he has a debilitated medical condition which has left him partially or completely disabled

3

(DE 363 at 50). The warden denied Callum's request, explaining that despite his diagnoses of type 2 diabetes mellitus, obesity, hyperlipidemia, sleep apnea, essential primary hypertension, and other symptoms involving the digestive system and abdomen, Callum was being treated in accordance with "evidenced based standards," was stable, and maintains normal life expectancy for his age. *Id.* at 51.

Now, approximately twelve years after his conviction, Callum files a *pro se* motion for compassionate release, claiming that his age, length of time served, changes in the law, rehabilitation, unusually harsh prison conditions, medical issues, programming, the resurgence of COVID-19, and family circumstances support his release (DE 362).

## II.    LEGAL FRAMEWORK

The "authority of a district court to modify an imprisonment sentence is narrowly limited by statute." *United States v. Phillips*, 597 F.3d 1190, 1194–95 (11th Cir. 2010). Federal law permits a district court to modify a prisoner's sentence "to the extent otherwise expressly permitted by statute or by Rule 35 of the Federal Rules of Criminal Procedure," and sets forth the necessary analysis for determining whether the petitioner is entitled to such a reduction. *See* 18 U.S.C. § 3582.

The Court must first ascertain whether the Defendant has "fully exhausted all administrative rights to appeal a failure of the [BOP] to bring a motion on the defendant's behalf or [whether there has been a] lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier." 18 U.S.C. § 3582(c)(1)(a). The Court must then consider the 18 U.S.C. § 3553(a) factors, to the extent they are applicable. *Id.* Third, the Court must determine whether "extraordinary and compelling reasons" as outlined in U.S.S.G. § 1B1.13,

justify release. Finally, the Court must assess whether the defendant poses a "danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g). *Id.*

## III.   ANALYSIS

### A.   The Defendant Exhausted His Administrative Remedies.

The Defendant submitted a request for compassionate release to the BOP in October 2023, and his request was denied because, despite his medical conditions, he was stable and being appropriately treated. He has therefore exhausted his administrative remedies.

### B.   The Defendant Has Not Demonstrated Extraordinary and Compelling Reasons to Justify a Reduction of his Sentence.

Callum's circumstances are neither extraordinary nor compelling. The Sentencing Commission "describe[s] what should be considered extraordinary and compelling reasons" as that term is defined in 18 U.S.C. § 3582. *See* 28 U.S.C. § 994(t).

On November 1, 2023, the Commission amended the policy statement to six categories that could constitute extraordinary and compelling reasons for a sentence reduction: (1) medical circumstances of the defendant; (2) age of the defendant; (3) family circumstances of the defendant; (4) victim of abuse; (5) other reasons; and (6) unusually long sentence. U.S.S.G. § 1B1.13(b). As the movant, the defendant bears the burden to establish his eligibility for a sentence reduction. *United States v. Green*, 764 F.3d 1352, 1356 (11th Cir. 2014).

Callum argues that he is entitled to compassionate release due to his age, length of time served, changes in the law, rehabilitation, unusually harsh prison conditions, medical issues, the resurgence of COVID-19, and family circumstances (DE 362 at 1). These reasons are not extraordinary and compelling; therefore, his motion must be denied.

        i.    The Defendant's Age is not an Extraordinary and Compelling Reason Justifying Relief

The Defendant's first basis for seeking compassionate release is his age. The Defendant is

a 57-year-old man who has served less than the minimum mandatory sentence mandated by his offense of conviction. Pursuant to U.S.S.G. § 1B1.13(b)(2), for the age of the defendant to constitute an extraordinary and compelling reason supporting release, the defendant must be (A) at least 65 years old; (B) experience a serious deterioration in physical or mental health because of the aging process; and (C) served at least 10 years or 75 percent of his or her term of imprisonment, whichever is less. Although Callum has served more than 10 years of his life sentence, he is neither 65 years old nor experiencing a serious deterioration in his physical or mental health due to the aging process, so he cannot meet his burden under this factor.

      ii.      The Length of the Defendant's Sentence was Not Unusually Long and Does Not Support Compassionate Release

The Defendant argues that his sentence is unusually long and that a change in the law supports his request for compassionate release (DE 363 at 20-21). Under U.S.S.G. § 1B1.13(b)(6), if a defendant received an unusually long sentence and has served at least 10 years of the term of imprisonment, courts may consider any intervening changes in the law (other than an amendment to the Guidelines Manual that has not been made retroactive), in determining whether the defendant presents an extraordinary and compelling reason. This is true only where "such a change in the law would produce a gross disparity between the sentence being served and the sentence likely to be imposed at the time the motion is filed." *Id.*

This Guideline provision cited by the Defendant in support for his request does not apply here. First, the Defendant has failed to articulate any change in the law, nor is the Government aware of any change, that would render his sentence grossly disparate to one he would have received today. Although the 2023 Amendments to the Sentencing Guidelines touched on many types of crimes and offenders, these amendments did *not* lessen the penalties for those who have committed sexual abuse offenses, nor have the mandatory minimum penalties associated with the

offenses of conviction changed. *See* 18 U.S.C. § 1591(b)(1) (proscribing 15-year minimum mandatory sentence). Therefore, the Defendant's citation to USSG § 1B1.13(b)(6) is misplaced and does not support his request.

      ii.      The Defendant's Mother's Old Age Does Not Constitute an Extraordinary and Compelling Reason Justifying Relief.

The Defendant argues that he should be released because he needs to care for his elderly mother, and his brother, who currently cares for her, can no longer do so (DE 363 at 22). Although the Defendant supplied his mother's medical records (DE 363, Ex. 6), he has not provided any information to explain why his brother, who 67 years old and currently lives with his mother, can no longer provide care. For "family circumstances" to constitute extraordinary and compelling reasons, the Defendant must show either (1) The incapacitation of the defendant's parent when the defendant would be the only available caregiver for the parent or (2) the death or incapacitation of a caregiver for the Defendant's parent, when the Defendant would be the only available caregiver for the parent. U.S.S.G. § 1B1.13(b)(3)(C)-(D).

The Defendant has not supplied any information explaining why his 67-year-old brother is incapable of caring for his elderly mother. He merely asserts that his brother has serious medical issues and is unable to function as a caregiver but provides not explanation of his brother's medical issues or how they interfere with his ability to care for their mother. Plainly, the Defendant has not met his burden establishing extraordinary and compelling reasons under this provision. *See United States v. Bell*, 2021 WL 510246, at *4 (M.D. Fla. Feb. 11, 2021) (denying motion for compassionate release where defendant argued that he needed to assist his working wife in caring for elderly parents); *United States v. Bulgakov*, 2022 WL 2802948, at *4 (M.D. Fla. July 18, 2022) (denying motion where defendant sought release to care for his elderly parents).

      iii.     The Defendant's Medical Conditions are Well-Managed, and His Refusal to Receive Medical Treatment Cannot Support His Request for Relief.

7

The Defendant argues that his medical conditions, including Type 2 diabetes mellitus, hypertension, obesity, hyperlipidemia, and sleep apnea, coupled with the resurgence of COVID-19, constitute extraordinary and compelling reasons justify release (*See* DE 464 at 10-18). For a medical condition to constitute an extraordinary and compelling reason justifying compassionate release, the movant bears the burden of showing that his medical condition substantially diminishes his ability to "provide self-care within the environment of a correctional facility and from which he or she is not expected to recover." U.S.S.G. § 1B1.13(b)(1). The Defendant fails to meet that burden.

First, the Defendant has been prescribed medication for his Type II diabetes, hypertension, hyperlipidemia, and he has received lifestyle counseling regarding his obesity (*See* Ex. 1 at 2-3)[1] (detailing prescriptions for Type II diabetes, hypertension, and hyperlipidemia, as recently as June 2024). But the Defendant has repeatedly and inexplicably refused certain treatments offered to him by the BOP. As recently as March 2024, the Defendant. . .

> refused to have blood work drawn for the second time this month. He also refuses insulin treatment. His commissary account was reviewed, and it is loaded with all kinds of unhealthy junk food. The patient is noncomplian[t] with medical recommendations which puts him a risk of sudden diabetes-related cardiovascular complication and death. He has been educated on treatment plan, dietary and lifestyle changes. It is his responsibly to comply and to take care of his medical conditions.

*Id.* at 12. This refusal was not an isolated incident. The October 2023 medical records state that the Defendant "does not have any insulin prescribed because he has refused. He was evaluated by the [doctor] in July 2023[,] and he signed a refusal form." *Id.* at 20. The records further state that, "inmate constantly purchases an increased number of items that contain high amount of carbs and

---

[1] Sealed Exhibit 1 is a copy of the Defendant's medical records from 2023-2024. Sealed Exhibit 2 is a copy of the Defendant's medical records from 2022-2023, and sealed exhibit 3 is a copy of the Defendant's medical records from 2021-2022.

sugar." *Id.* The Defendant cannot argue that his health is deteriorating because it is not well-managed by the Bureau of Prisons while simultaneously refusing the management of his health by the Bureau of Prisons. Certainly, any conditions caused or exacerbated by his unwillingness to comply with medical recommendations cannot form the basis for "extraordinary and compelling reasons" under the law.

The same is true of the Defendant's generalized reference to the increased risk of contracting COVID-19 (DE 363 at 26). The defendant has refused the COVID-19 booster (Ex. 3 at 52) yet argues that he is "at an increased risk to have severe and potentially fatal complicates if he is infected with COVID-19." (DE 363 at 26). The Defendant has had the opportunity to receive additional immunity from COVID-19 via the booster and to, therefore, avoid the risks that form the basis for this part of his motion. He has inexplicably refused a booster, and thus cannot now convincingly argue that an increased risk of COVID-19 constitutes an extraordinary and compelling reason. *United States v. Rojas*, No. 18-20923-CR, 2021 WL 1895810, at *6 (S.D. Fla. May 11, 2021) (Altman, J.) (recognizing that the defendant's once-legitimate concerns about Covid-19 would become moot upon availability of a vaccine to protect against serious Covid-19 infections); *see also United States v. Parker*, No. 06-60130-CR, 2021 WL 2434270, at *3 (S.D. Fla. June 14, 2021) (Moreno, J.) (denying motion for compassionate release for failure to identify extraordinary circumstances, explaining "Defendant argues that he has a high probability of being exposed to COVID-19 but the extensive availability of vaccines clearly rebuts that dated argument.")

The Defendant also claims that he has been denied the use of a Continuous Positive Airway Pressure Machine ("CPAP") machine to treat his sleep apnea (DE 363 at 17-18) ("The defendant requires a CPAP machine in order to breath at night, but he has been denied the use during the

pandemic and he has no recourse."). That is not true. The Defendant's medical records detail that he has was prescribed a CPAP machine in January 2023 after the completion of a sleep study, and that he still has a CPAP machine assigned to him (Ex. 1 at 26, 37; Ex. 2 at 18, 41, 56, 90-91). The Defendant's sleep apnea is therefore well-managed and does not constitute an extraordinary and compelling reason for his release.

In sum, the Defendant has misstated his access to certain medical treatments and refused others. He cannot claim that his litany of medical ailments therefore constitute extraordinary and compelling reasons for relief. The Defendant has the ability to provide self-care within the environment of a correctional facility, he just chooses not to.

C.   The Section 3553(a) Factors Strongly Disfavor Release

i.   The Nature and Circumstances of the Offense

The nature and circumstances of the offense are despicable. The defendants lured women to South Florida, drugged, and raped them, and video-recorded the rapes to sell online and at pornography stores across the country (DE 149 at 2). Although co-defendant Flanders lured and drugged the women, Callum callously raped them, sometimes for hours on end. Seven victims of the defendants' heinous crimes testified at trial; however, the Government identified as many as 50 women who had filed complaints virtually identical to the seven women who testified at trial (DE 217 at 68). Notably, the victim complaints of sexual assault occurred as early as 2006, six years before the Defendant was sentenced in this case. *Id.* at 72.

If sexually abusing the victims while they were drugged and nearly unconscious were not disturbing enough, Callum further degraded the victims by ejaculating on their faces and mocking them—for being unable to keep themselves awake and, in the case of one victim who had just turned eighteen, for her virginity (DE 149 at 3). As to that victim, S.B., Callum so forcefully

penetrated her that, though she did not realize it at the time, she began bleeding profusely from her vagina. *Id.* at 6. And Callum profited from these deplorable acts by producing, editing, and distributing the video recordings for money. As explained in the United States' Sentencing Memorandum, "[t]he true nature and extent of the victims' degradation is impossible to measure because, aside from being raped and video-taped, the video-recordings of the victims' sexual assaults will be broadcast over the Internet for all time." *Id.* at 3. In imposing sentence, the Court agreed that, "[t]he conduct by the defendant in this case was unusually heinous, cruel, brutal, and degrading to the victims." (DE 217 at 80).

> ii.   The Need to Protect the Public and Promote Respect for the Law

The Court correctly concluded that life imprisonment is the only appropriate sentence that would protect the public from future crimes of the Defendant. Despite having been arrested on state charges for the pattern of behavior he was ultimately convicted of here, Callum continued raping women while out on state bond, demonstrating his complete disregard for the law and inability to be rehabilitated (DE 149 at 10). Although the Defendant argues that he has been rehabilitated through programming within the BOP (DE 363 at 35), the exhibits attached to his request for compassionate release paint a different picture. Callum submitted multiple letters from friends and family which state that he has been wrongfully convicted. In a letter from Callum's cousin, Ernie Ramsey, he writes, "Emerson is currently serving time in Federal Prison for a crime he did not commit." (DE 363 at 77). This letter, among several others submitted by the Defendant in support of his motion, ask for the Defendant to be pardoned for his crimes to "rectify [the] injustice" of his "wrongful conviction." *Id.* at 77-78. Despite his claims to the contrary, Callum's motion does not paint a picture of a rehabilitated individual who made an isolated mistake. As the Government aptly noted during Callum's sentencing hearing, Callum "[doesn't] acknowledge that

[he's] done anything wrong." (DE 217 at 62-63). The same appears true, even twelve years later.

And even if the Defendant could show some modicum of rehabilitation, he would still pose a danger to the women in our community, who he so cruelly degraded over the course of so many years and who undoubtedly still suffer knowing that pornography of their abuse can be viewed on the Internet for eternity. In sum, the Section 3553(a) factors still support a conclusion that life imprisonment is the only appropriate sentence for the Defendant.

C. <u>The Defendant Remains a Danger to the Public.</u>

Callum's Motion fails for yet another reason—because he hasn't shown that he no longer poses a danger to his community. As the relevant Guidelines provision makes clear, the "extraordinary and compelling reasons" test only applies if "the defendant meets the requirements of subdivision (2)"—that is, only if the Defendant demonstrates that he no longer poses a threat to society, as defined by 18 U.S.C. § 3142. *see also Bryant*, 996 F.3d at 1247; *United States v. Clark*, 2021 WL 4282602, at *2 (11th Cir. 2021) ("A supported finding of dangerousness…is sufficient for denial of a compassionate release motion.").

In determining whether the Defendant is a danger to the community, the Court must consider: (1) "the nature and circumstances of the offense charged;" (2) "the weight of the evidence against" the Defendant; (3) "the history and characteristics of" the Defendant; and (4) "the nature and seriousness of the danger to any person or the community that would be posed by his release." *See* 18 U.S.C. § 3142(g).

Callum incorrectly claims that he "does not pose any type of danger whatsoever to any person or to the community, as he knows the consequences of any type of misbehavior" (DE 363 at 38). This claim is belied by the simple fact that Callum raped two of his victims while out on state bond. While Callum may know the consequences of misbehavior, he disregards them in the

12

same way he does the advice of medical personnel. Callum poses a grave danger to society, and to women in particular. The weight of the evidence against him was overwhelming. Over the course of several years, Callum raped countless women, memorializing and profiting from his disgusting abuse. He remains a danger to society and cannot be released from imprisonment.

## IV.   CONCLUSION

The Defendant has not satisfied his burden. The 18 U.S.C. § 3553(a) strongly disfavor release, and the Defendant continues to pose a grave threat to society. For these reasons, this Court should deny the motion.

Respectfully submitted,

MARKENZY LAPOINTE
UNITED STATES ATTORNEY

By:   _/s/ Arielle F. Klepach_____
        Arielle F. Klepach
        Assistant United States Attorney
        Court ID No. A5502706
        99 NE 4th Street, 5th Floor
        Miami, FL 33133
        Tel: (305) 961-9272
        Arielle.Klepach@usdoj.gov